# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

―――――――――――――

## No. 201700178

―――――――――――――

## UNITED STATES
*Appellee*

v.

## Jacob A. PATRICK
Lieutenant (O-3), U.S. Navy
*Appellant*

―――――――――――――

Appeal from the United States Navy-Marine Corps Trial Judiciary

*Military Judge:* Captain Charles Purnell, JAGC, USN.

*For Appellant:* Mr. Zachary Spilman, Esq.;
Lieutenant Commander William L. Geraty, JAGC, USN.

*For Appellee:* Captain Sean M. Monks, USMC;
Major Kelli A. O'Neil, USMC.

―――――――――――――

Decided 11 December 2018

―――――――――――――

Before WOODARD, FULTON, and CRISFIELD,
*Appellate Military Judges*

―――――――――――――

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

―――――――――――――

WOODARD, Chief Judge:

A panel of officer members sitting as a general court-martial convicted the appellant, contrary to his pleas, of two specifications of sexual assault in violation of Article 120(b), Uniform Code of Military Justice (UCMJ), 10 U.S.C.

§ 920 (2012).[1] The members sentenced the appellant to 12 months' confinement, a reprimand, and dismissal from the Naval Service. The convening authority (CA) approved the sentence and, with the exception of the dismissal, ordered it executed.

The appellant has raised the following assignments of error (AOEs):[2] (1) the military judge improperly instructed the members regarding the required *mens rea*; (2) it was plain error to admit DNA and sleep disorder expert testimony; (3) the trial counsel committed prosecutorial misconduct in his closing and rebuttal arguments; (4) the military judge abused his discretion by admitting lay witness testimony concerning the victim's demeanor, and expert testimony concerning the victim's blood alcohol concentration (BAC); (5) the evidence was legally and factually insufficient to prove penetration or that the victim was asleep or unconscious; (6) the trial defense counsel provided ineffective assistance; (7) the sentence, which included the mandatory minimum of a dismissal, was inappropriately severe; and (8) there is error in the court-martial order (CMO).

After careful consideration of the record of trial and the pleadings of the parties, we conclude that the CMO does contain error and direct corrective action in our decretal paragraph. After correcting this error, we find that the findings and the sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ.

---

[1] The appellant was convicted of two specifications for the same conduct under two different theories of liability. Specification 3 of the charge alleged that the appellant digitally penetrated his victim "by causing bodily harm" in violation of Article 120(b)(1)(B), UCMJ; Specification 4 of the charge alleged that the appellant digitally penetrated his victim while she was "asleep or unconscious" in violation of Article 120(b)(2), UCMJ. Charge Sheet. After findings, the military judge conditionally dismissed Specification 4 without prejudice, to ripen into prejudice upon completion of appellate review. Record at 1232-33, 1239, and 1241; Charge Sheet; AE LXXXIII (Findings Worksheet) and XCI (Sentencing Cleansed Charge Sheet). The appellant was also acquitted of two specifications of sexual assault alleging penile penetration of the victim's vulva charged under the same two theories of liability, in violation of Articles 120(b)(1)(B) and 120(b)(2), UCMJ.

[2] The appellant raised a total of 11 AOEs for our consideration. We have reordered and consolidated several of the AOEs in order to more clearly address the raised errors and applicable law.

## I. BACKGROUND

The appellant and LCDR LS were pilots assigned to a squadron embarked on an aircraft carrier. LCDR LS had just joined the squadron while it was forward deployed. She was assigned as a department head in the squadron. The appellant, already with the squadron when LCDR LS arrived, was performing duties in another department. Before arriving at the squadron, the only interaction LCDR LS had ever had with the appellant occurred 10 years earlier when, as a flight instructor, LCDR LS performed a single evaluation flight with him.

When their ship made a port call in Bahrain, a group of their squadron's officers—including LCDR LS and the appellant—rented two rooms—commonly referred to as "admins"—for the port call. Each admin consisted of a suite of rooms that included two bedrooms, a living area, kitchen, and multiple bathrooms. The officers staying in the admins would come and go between the admins and the ship as necessary to fulfill their duty obligations. The "admins" were suites of hotel rooms where the squadron's officers would gather to sleep and socialize away from the ship. One of the admins was referred to as the "quiet" admin where the more senior officers slept. The other was referred to as the "party" admin where most of the socializing took place and the more junior officers slept. The two admins were located on separate floors of the hotel.

As the only female pilot in the squadron, before agreeing to join her male squadron mates in renting the admins, LCDR LS asked one of her fellow lieutenant commanders if she should get her own room. He assured her that, even though she would be the only female in the admins, there would be no problem with her staying with them.

On the first night the ship was in port, LCDR LS slept on a roll-away bed in the living area of the quiet admin. The following day she returned to the ship for duty as the Air Wing Duty Officer. This duty was a 24-hour watch during which she was allowed to sleep but she was only able to get approximately four hours of sleep. The appellant, who had not been ashore the first night of the port call, slept in the roll-away bed previously occupied by LCDR LS. After being relieved from duty, LCDR LS rejoined her squadron mates at the hotel to relax and socialize.

After returning to the hotel, throughout the day and into the evening hours, LCDR LS consumed several alcoholic drinks with her squadron mates at multiple venues in and around the hotel to include the pool, restaurant, and finally, the party admin. The appellant had also been drinking throughout the day and into the evening hours at many of the same locations. However, other than conversation in passing, there had been no personal or flirta-

tious interaction between LCDR LS and the appellant. At approximately 0100 LCDR LS decided to call it a night and went to the quiet admin to get some sleep.

Before going to bed, LCDR LS made and ate dinner, and had a brief conversation with another officer who was staying in the quiet admin. After putting on pajamas, and without knowing that the appellant had slept in the roll-away bed the night before, LCDR LS went to sleep on the roll-away bed. She fell asleep around 0200. Sometime later that morning, the appellant came into the room and got into the bed with LCDR LS.

Another squadron officer, LT AT, who was sleeping on a couch in the living area of the room was awakened by the appellant entering. LT AT heard what he described as indiscernible mumbling—but he did hear someone say "water." At trial he could not recall if it was a male or female voice that spoke the word. He also heard the crinkling of a water bottle, and, a bit later, what he believed to be the roll-away bed creaking, kissing sounds, and a female moaning. Although he did not investigate the sounds, and tried to go back to sleep, he was soon thereafter awakened when he heard LCDR LS saying: "What's going on? Why are you on top of me? Get off of me."[3] These statements were also heard by several other witnesses in the quiet admin. LT AT further explained that LCDR LS kept repeating herself, each time the volume of her voice increasing. When he sat up on the couch to see what was happening, LT AT saw the appellant get off the roll-away bed while fastening his pants, and LCDR LS running to the corner of the room screaming, "[g]et off me, [w]hat are you doing[,]" and "[h]e raped me."[4]

Also awakened by the commotion, several of the other squadron officers staying in the bedrooms of the quiet admin entered the living room area. As one of them opened the door to the bedroom, LCDR LS ducked under his arm into the room and "crawled up into a ball next to [his] bed."[5] The witness described LCDR LS as hysterical and screaming "[g]et him away from me. Oh, my God. . . . He raped me."[6] The appellant, meanwhile, repeatedly stated that nothing happened and that he was just trying to give her water. By all accounts, LCDR LS began yelling somewhere between 0400 and 0420.

To separate them, LCDR LS was placed in one of the quiet admin bedrooms, and the appellant was escorted to the party admin. Medical and mili-

---

[3] Record at 628.

[4] *Id.* at 631.

[5] *Id.* at 684.

[6] *Id.*

tary law enforcement personnel were notified and responded. By 0600 LCDR LS had arrived at the Naval Branch Health Clinic—Bahrain. At the clinic she underwent a sexual assault forensic examination (SAFE). Although she arrived at the clinic at 0600, because of her emotional state, she did not begin the SAFE until 1000. The appellant was also taken to the clinic where he underwent a SAFE as well. Among the items of evidence collected from both the appellant and LCDR LS during the exams were DNA swabs and urine and blood samples. The evidence collected from their examinations was sent to and forensically examined by employees of U.S. Army Criminal Investigation Laboratory (USACIL). Testing on the evidence revealed that LCDR LS had a BAC of 0.1 at the time her sample was drawn and the appellant had a BAC of 0.08 at the time his sample was drawn.[7] The DNA evidence collected showed that the appellant had a DNA profile consistent with LCDR LS's on the tip and shaft of his penis as well as his pubic mound. It also revealed a DNA profile consistent with the appellant's from inside of LCDR LS's vulva. Additionally, the testing found very minor traces of male DNA inside LCDR LS's vaginal canal. Due to the limited amount of male DNA found in LCDR LS's vaginal canal, the examiner was unable to determine whether the appellant was a likely match or not.

At trial, the defense pursued multiple reasonable doubt theories: LCDR LS consented, but lied about being asleep when the sexual act occurred in order to avoid being disciplined for engaging in sexual conduct with a junior officer; the appellant held an honest and reasonable mistake of fact as to LCDR LS's consent to the sexual act; there was no penetration of LCDR LS's vulva by the appellant because any male DNA found inside her vulva could be the result of transference; and although the male DNA found inside LCDR LS's vulva included the appellant as a potential contributor, because of the large number of potential other males also included, there was reasonable doubt that it was actually his DNA.

Additional facts necessary to the resolution of the issues will be discussed below.

---

[7] All BAC calculations mentioned are expressed as a percentage of milligrams of ethanol per deciliter of blood. For example, LCDR LS's BAC of 0.1 percent represents 100 milligrams of ethanol per deciliter of blood.

## II. DISCUSSION

### A. Required *Mens Rea*

The appellant was convicted of penetrating LCDR LS's vulva with his finger, without her consent, in violation of Article 120(b)(1)(B), UCMJ; and of penetrating LCDR LS's vulva with his finger when he knew or reasonably should have known that she was asleep, unconscious, or otherwise unaware in violation of Article 120(b)(2), UCMJ. The appellant avers, relying on *Elonis v United States*, 575 U.S. ___, 135 S. Ct. 2001 (2015),[8] that the military judge erred when instructing the members on the elements of the offenses for which he was convicted by failing to instruct on the required *mens rea*. The appellant argues that because lack of consent is a material element of the offenses and because Congress was silent as to an applicable *mens rea* for this element, *Elonis* requires this court to apply a *mens rea* of at least recklessness to the offenses. We disagree. The offenses under Article 120(b), UCMJ, with which the appellant was charged and convicted do not fall within the category of statutes addressed in *Elonis*.

Determining what *mens rea* is applicable to an offense "is a question of law which we review *de novo*." *United States v. Gifford*, 75 M.J. 140, 142 (C.A.A.F. 2016). "[I]n doing so, we invoke the traditional rules of statutory construction." *Id.* (citations omitted). The Supreme Court has "long recognized that determining the mental state required for commission of a federal crime requires 'construction of the statute and . . . [if necessary,] inference of the intent of Congress.'" *Staples v. United States*, 511 U.S. 600, 605 (1994) (quoting *United States v. Balint*, 258 U.S. 250, 253 (1922)).

"[T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *United States v. US Gypsum Co.*, 438 U.S. 422, 436 (1978) (citation omitted). "Although there are exceptions, the 'general rule' is that a guilty mind is 'a necessary element in the indictment and proof of every crime.'" *Elonis*, 575 U.S. at ___, 135 S.Ct. at 2009 (quoting *Balint*, 258 U.S. at 251).

If a statute is silent regarding the required *mens rea* we must seek to determine whether Congress expressly or implicitly purposefully omitted the requirement, and, if we determine that it was purposefully omitted, we must "respect that legislative intent." *United States v. Haverty*, 76 M.J. 199, 203-04 (C.A.A.F. 2017) (citing *Gifford,* 75 M.J. at 143-44). On the other hand, if the statute is silent regarding the required *mens rea*, and we determine Con-

---

[8] Although *Elonis* was decided a year and a half before the appellant's trial, the appellant did not raise the issue of the *mens rea* requirement at trial.

gress, "either expressly or implicitly," intended the statute "to have a particular mens rea requirement[,]" then [we] must construe the statute accordingly. *Haverty*, 76 M.J. at 204 (citing *Elonis,* 575 U.S. ___, 135 S.Ct. at 2009-10; *Staples,* 511 U.S. at 606). However, "psychoanalyzing those who enacted" Article 120(b)(1)(B), UCMJ, is not required here because we can determine the *mens rea* of the offense with which the appellant was charged and convicted "by examining the text" of the statute. *Carter v. United States*, 530 U.S. 255, 271 (2000).

The Article 120(b), UCMJ, offenses of which the appellant was convicted are not silent as to *mens rea.*[9] Because the sexual act alleged was the digital penetration of LCDR LS's vulva, the government was required to prove beyond a reasonable doubt that the appellant committed the alleged sexual act. That he did so either without her consent, or when he knew or reasonably should have known she was asleep, unconscious or otherwise unaware. And that the sexual act was done by the appellant with the "intent to abuse, humiliate, harass, or degrade any person," or "to arouse or gratify the sexual desire of any person." Article 120(g)(1)(B), UCMJ.

As the specific *mens rea* of the bodily harm element of this offense is contained within the statutory definition of the term "sexual act," we need not read an additional *mens rea* requirement into the offense.[10] Accordingly, we find that the military judge properly instructed the members on the required *mens rea* for the offense charged. This AOE is without merit.

---

[9] Our review of the *mens rea* requirement for Article 120(b)(1)(B), UCMJ, offenses is limited to the specific facts of this case and the manner in which the appellant's offenses were charged here—sexual assault by digital penetration of the victim's vulva without her consent. We have not and do not address the application of *Elonis* where the manner of sexual assault is charged under Article 120(b)(1)(B) as penile penetration of the victim's vulva without consent. Nor do we address situations where the sexual act and bodily harm are alleged as different acts.

[10] As our sister court of criminal appeals did in *United States v. Rivera*, No. 20160393, 2017 CCA Lexis 740 (A. Ct. Crim. App. 28 Nov. 2017) (unpub. op.) *rev. denied,* 77 M.J. 313 (C.A.A.F. 2018), we too "reject [the] appellant's assertion that 'lack of consent' is a material element of the crime of sexual assault . . . requiring a separate mens rea. Consistent with our superior court, we believe it is more precise to treat the 'nonconsensual' requirement [of Article 120(b)(1)(B), UCMJ,] as a potential subsidiary fact with respect to the element of bodily harm rather than a distinct element of the offense." *Rivera*, 2017 CCA LEXIS 740 at 7 note 3. *See United States v. Neal*, 68 M.J. 289, 301-02 (C.A.A.F. 2010) (interpreting the 2006 version of Article 120, UCMJ, to allow "treating evidence of consent as a subsidiary fact potentially relevant to a broader issue in the case, such as the element of force.").

**B. Admission of DNA and sleep disorder expert testimony**

For the first time on appeal, the appellant asserts that it was plain error to admit the following portions of the DNA expert's testimony: (1) that his DNA findings were consistent with penetration without ejaculation; and (2) that it was 18 times more likely that the male DNA found inside LCDR LS's vulva came from the appellant or a paternal male relative than from a randomly selected male.

He also asserts, again for the first time on appeal, that it was plain error to admit portions of the sleep disorder expert's testimony. Specifically, the appellant avers it was error to allow the sleep disorder expert to opine that the most likely explanation for LCDR LS's inability to remember what happened between the time she fell asleep and when she awoke to the sexual assault was that she was asleep.

When an appellant has failed to object to the testimony provided by an expert witness, he has forfeited his right to claim the error on appeal absent plain error. *United States v. Raya*, 45 M.J. 251, 253 (C.A.A.F. 1996) (citation omitted); *see also United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (holding the same).

"Plain error is established when: (1) an error was committed; (2) the error was plain, clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007). The burden is on the appellant to show all three prongs of the test are satisfied. *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006). We review for plain error *de novo*. *United States v. Mullens*, 69 M.J. 113, 116 (C.A.A.F. 2010).

MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 702, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), allows a witness to testify as an expert on a particular subject matter if the witness is qualified to do so based on his or her knowledge, skill, experience, training, or education regarding that subject. The testimony provided by the expert must: (1) be helpful to the trier of fact in understanding the evidence or in determining a fact in issue; (2) be based on sufficient facts or data; (3) be the product of reliable principles and methods; and (4) in providing his testimony, the expert must reliably apply those principles and methods to the facts of the case. MIL. R. EVID. 702. If the expert testifies in the form of an opinion, that opinion may be based "on facts or data in the case that the expert has been made aware of or personally observed." MIL. R. EVID. 703.

The proponent of expert testimony must establish: (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the relevance of the testimony; (5) the reliability of the

testimony; and (6) the probative value of the testimony. *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993). "As gatekeeper, the trial court judge is tasked with ensuring that an expert's testimony both rests on a reliable foundation and is relevant." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007). In performing this gatekeeping function, four factors a judge may use to determine the reliability of expert testimony are:

> (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993)).

It is not necessary to satisfy every *Daubert* or *Houser* factor as "the inquiry is 'a flexible one,'" and "the factors do not constitute a 'definitive checklist or test.'" *Sanchez*, 65 M.J. at 149 (quoting *Daubert*, 509 U.S. at 593-94). Although a *Daubert* hearing is not required every time an expert witness is called to testify, the military judge is obligated to take an active "gatekeeper" approach when the proffered evidence is "called sufficiently into question." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

### 1. DNA expert testimony

The DNA expert testimony complained of by the appellant was provided by the government's expert witness, Mr. T. Despite being provided his own DNA expert assistant who was also listed as a possible expert witness,[11] the appellant never challenged or objected to Mr. T's credentials as an expert in the field of DNA testing and analysis, or the testimony he provided at trial. Hence, the military judge was never called upon to place his *Houser* or *Daubert* analysis on the record.

Our review of the record and pleadings in the case reveals that the appellant does not challenge or question the expert testimony provided by Mr. T on any *Daubert* basis. Nor does he claim that any of the first three *Houser* factors went unsatisfied. Instead, he argues that the expert's testimony—that his findings were consistent with penetration without ejaculation—was unreliable because it was not based on the scientific facts and data developed by

---

[11] *See* AE XXV.

the DNA testing in this case. The appellant characterizes Mr. T's testimony as "pseudo-scientific speculation"[12] that was "not helpful to the finder of fact because it was wrong."[13] Additionally, he argues the probative value of the expert's testimony regarding the statistical probabilities of the male DNA found on the external swab of LCDR LS's vulva was outweighed by its likelihood to mislead the members. Accordingly, he avers *Houser's* fifth and sixth factors and its corresponding MIL. R. EVID. 702 requirements were not satisfied.

a. "Consistent with penetration without ejaculation" testimony

When questioned by the trial counsel whether his findings were consistent with the proposition of "penetration [of LCDR LS's vagina[14]] but no ejaculation inside [of it,]" Mr. T acknowledged that they were.[15] We note that the trial counsel did not ask Mr. T if his findings were consistent with the penetration of LCDR LS's vulva by the *appellant's* finger or penis without the *appellant* ejaculating in her—nor did Mr. T provide such an opinion. We also note, although not complained of by the appellant, that Mr. T additionally testified that his findings were also not inconsistent with "consensual non-penetration sexual activity."[16]

The evidence developed on the record indicates that, although the appellant's own SAFE exam revealed the presence of his semen, no semen was discovered on any items of evidence obtained during LCDR LS's SAFE. Despite the absence of semen on items obtained during LCDR LS's SAFE, male DNA was found on the internal swab of LCDR LS's vaginal canal. Although that male DNA was not of sufficient quantity to develop a DNA profile for comparison to the appellant's reference DNA profile, it was found in LCDR LS's body

---

[12] Appellant's Brief of 8 Jan 2018 at 28.

[13] Appellant's Brief at 27.

[14] Throughout trial all counsel, LCDR LS, and other witnesses often used the term "vagina." The vagina is "the canal in the female, extending from the vulva to the cervix uteri, which receives the penis in copulation. Richard Slone, *The Slone-Dorland Annotated Medical-Legal Dictionary,* 764 (1987). The vulva is the "external genital organs of the female, including the labia majora, labia minora [the labia majora and minora are commonly referred to as the lips of the vulva], mons pubis, bulb of the vestibule, vestibule of the vagina, greater and lesser vestibular glands, and vaginal orifice." *Id.* at 138.

[15] Record at 923.

[16] *Id.* at 927.

at a location where "male DNA doesn't suddenly appear" and "has to be in-serted in some way."[17]

Regarding the male DNA found on the internal swab of LCDR LS's vagi-nal canal, Mr. T testified that his findings could not indicate whether there was penetration of LCDR LS's vagina; whether the male DNA on the internal swab resulted from sexual activity—consensual or nonconsensual; or wheth-er, if LCDR LS's vagina had been penetrated, it was by a penis or finger. Our review of the record does not reveal that Mr. T ever attempted to link or asso-ciate the semen on the evidence obtained from the appellant's SAFE with the penetration of LCDR LS's vulva.

We do not find Mr. T's testimony to be pseudo-scientific speculation. To the contrary, we find his testimony to be well grounded in the facts and data resulting from his testing and presented accordingly. He testified that he found male DNA and where he found it. He further testified that he could not conclusively state the manner or mode by which the DNA arrived at the loca-tion it was found and that both the prosecution's and the defense's proposi-tions of how the DNA evidence in this case arrived at its ultimate locations were not inconsistent with his findings. Furthermore, upon review of the en-tire record, we find Mr. T was a qualified expert in the field of DNA testing and analysis who testified on matters he was qualified by reason of knowledge, skill, experience, training, and education to testify. His testimony was helpful to the trier of fact in understanding the DNA evidence and how it fit or did not fit into the evidentiary context of this case. Finally, we conclude the probative value of his testimony was not outweighed by other considera-tions.

We conclude that there was no error, let alone plain or obvious error, in the admission of this expert testimony. This assignment of error is without merit.

### b. DNA statistical probabilities testimony

The appellant also raises as error that Mr. T's testimony that the appel-lant, or a male paternal relative, is statistically 18 times more likely to be the contributor of the DNA profile found in LCDR LS's vulva than a randomly selected male was misleading.

Before trial, the government gave notice to the appellant that they in-tended to offer the results of the DNA testing performed on evidence obtained during the SAFEs of both the appellant and LCDR LS by filing a motion *in*

---

[17] *Id.* at 924.

*limine* to pre-admit the evidence. Attached to this motion was the summarized and detailed report of the testing and results—which included the likelihood ratio statistical probability calculations about which Mr. T would later testify at trial. The appellant did not file a response in opposition to the motion.

The statistical probability about which the appellant now complains arises from Mr. T's testimony concerning the results he obtained after testing the male DNA found on the external swab[18] of LCDR LS's vulva. Though the DNA on the internal swab previously discussed was not sufficient in quantity to develop a profile for reference comparison, the external swab did contain a sufficient quantity to develop a comparison male profile. Upon comparison of this profile to the reference profile of the appellant, Mr. T testified it was "18 times more likely" that the male DNA on the external swab came from the appellant or one of his paternal male relatives than if he had come "from a randomly selected male."[19] The appellant did not object to or challenge this likelihood ratio statistical frequency testimony.

As our superior court has noted, "[e]vidence of statistical probabilities is not only basic to DNA analysis, but also essential to the admissibility of that analysis. . . . [W]ithout evidence of statistical frequencies, DNA evidence is meaningless and would not be admissible." *Allison*, 63 M.J. 365, 369 (C.A.A.F. 2006) (internal quotation marks and citations omitted). The likelihood ratio is one of the three statistical probability calculations delineated by the Scientific Working Group on DNA Analysis Methods (SWGDAM) and used by DNA testing and analysis expert witnesses to provide the fact-finder with meaning and a mathematical context within which to evaluate their scientific findings. *See United States v. Henning*, 75 M.J. 187, 189-90 (C.A.A.F. 2016)[20] (referencing SWGDAM's delineation of the likelihood probability ratio as one of the three acceptable statistical probability calculations).

_____

[18] Although referred to as the "external vaginal swab," this swab was obtained by swabbing the interior of the labia majora—between the labia majora and labia minora—and inside the labia minora. Hence, the swab was obtained by rubbing areas all contained "inside the lips of the vagina—inside the lips of the vulva." Record at 887; PE 1.

[19] *Id.* at 924.

[20] We note the appellant cites to *Henning* and implicitly suggests that our superior court suppressed a DNA match because of its relatively low probability of implicating the appellant as a contributor to the DNA profile. This was not the case. In *Henning*, the court was dealing with the issue of whether the military judge had committed an abuse of discretion by suppressing the probability results after concluding the formula used by the expert was a modified formula—notably not a modified likeli-

We find nothing in the record to suggest that the likelihood ratio testified to by Mr. T concerning the male DNA profile that was found on the external swab was misleading to the members. This is especially so when considering the other likelihood ratios to which he testified concerning other DNA evidence admitted at trial. Mr. T testified that he developed DNA profiles from three items of evidence obtained during the appellant's SAFE—swabs from his pubic mound, and the tip and shaft of his penis. Mr. T testified that these likelihood ratios were 170 quadrillion (pubic mound), 20 quadrillion (penis shaft), and 13,000 (penis tip) times more likely that the DNA profile originated from the appellant and LCDR LS than if it originated from the appellant and an unknown female—yet the members acquitted the appellant of sexually assaulting LCDR LS by penetrating her vulva with his penis. Given the member's findings, we are not convinced they were misled by the likelihood ratio statistical probability testimony of Mr. T.

We conclude that there was no error, let alone plain or obvious error, in the admission of this expert testimony. This assignment of error is without merit.

### 2. Sleep disorder expert testimony

The appellant argues that it was plain error to allow the government's expert witness in sleep disorders, LTC W, to testify that the most likely explanation for LCDR LS's lack of memory between the time she fell asleep and awakened is that she was asleep. The appellant argues LTC W's opinion was not based on facts or data, but his opinion was based on personal feelings. The appellant also avers that this testimony was unfairly prejudicial, lacked probative value, and was improper human lie-detector testimony.[21] We disagree.

a. Was the opinion based on sufficient facts and data, and was it the product of the reliable application of the principles and methods to the facts of this case?

We begin our analysis with the following observations. Our review of the record convinces us that no motion or objection was lodged by the appellant

---

hood ratio formula—and the government had failed to meet its burden in establishing the modified formula's reliability under *Daubert*. As stated by the court, "[w]e do not hold that the [expert's] modified formula is unreliable. We only hold it was not an abuse of discretion for the military judge to find the government had not met its burden of showing the formula was reliable in this case." *Henning*, 75 M.J. at 192, n 16.

[21] The appellant did not object to LTC W's credentials as an expert or his trial testimony.

at trial to prohibit LTC W from rendering the opinion about which he now complains. We conclude that LTC W was qualified—in accordance with his knowledge, skill, experience, training, or education—to testify as an expert witness on issues involving sleep and the formation of memories. MIL. R. EVID. 701 and 702. An element of the appellant's offense charged as a violation of Article 120(b)(2), UCMJ, required that the government prove that, at the time of the sexual contact, LCDR LS was asleep or unconscious—thus unable to consent to the alleged sexual act. As such, we also conclude that LTC W's specialized knowledge concerning sleep architecture, the effect of alcohol and other factors on that architecture, and when a person is or is not forming memories would be helpful to the members in determining whether LCDR LS was actually asleep and not forming memories at the time of the sexual act. MIL. R. EVID. 702(a).

Before testifying at trial, LTC W reviewed a summary of LCDR LS's interview with Naval Criminal Investigative Service (NCIS) agents describing the circumstances surrounding the sexual assault, a video of the interview from which the summary was prepared, and observed LCDR LS's testimony at trial. After doing so, he testified that the most likely explanation for LCDR LS not having any memory from the time she went to sleep until she was awakened was that she was asleep. LTC W then went on to explain during his direct and cross-examination—generally referring to the numerous peer-reviewed, and published studies on the topics of sleep architecture and memory formation—the different stages of sleep. When those stages occur during normal sleep patterns. A person's ability to respond to external stimuli during those stages of sleep. The effect of sleep and alcohol on the formation of memories. Other factors that could affect sleep and ability to respond to stimuli during sleep such as stress, circadian rhythm, age, gender, and other medical conditions. Other sleep related disorders such as parasomnia and sexsomnia; and the likelihood of a person who is asleep to be able to engage in conversation, ask for and drink water, and make conscious decisions. LTC W acknowledged several times that being asleep was not the only possible explanation for why LCDR LS had no memory of the sexual act, and that he could not conclusively state that her lack of memory was attributable to her being asleep. But, given all the facts and data he had been provided—to include those pointed out by the defense in cross-examination—in his opinion, the most likely explanation for why LCDR LS had no memory of the sexual act was because she was asleep.

We have not limited our review of this issue to testimony provided on the merits. In a pretrial Article 39(a), UCMJ, session challenging the admissibility of LCDR LS's BAC, the military judge heard the dueling testimony of the government's and the defense's sleep disorder experts regarding whether LCDR LS's BAC was a relevant factor to be considered. The defense expert

testified that there are no scientific studies addressing LCDR LS's specific BAC from which he could reasonably draw any conclusions regarding its effect on sleep. However, he did acknowledge that there are peer-reviewed, and published studies examining the effects of alcohol on all stages of sleep that establish that alcohol does affect sleep. He also acknowledged that alcohol is a sedative and those with alcohol in their system tend to fall to sleep faster and may be more difficult to wake depending on their stage of sleep at the time. Despite not having their expert testify concerning the impact of alcohol on memory formation, the defense did submit several scholarly articles addressing this issue. In response, LTC W, although agreeing that there were no specific scientific studies addressing LCDR LS's specific BAC, testified that there were scientific studies on levels above and below her BAC and textbooks generally covering the effects of alcohol on sleep from which experts could draw scientific conclusions about the physiological impacts of such levels.

The test we apply is a flexible one, and we find the conflict in the expert testimony provided concerning LCDR LS's specific BAC does not establish that the principles and methods relied upon by LTC W in forming his opinion were unreliable. Nor do we find that he failed to reliably apply those principles and methods to the facts of this case. Having reviewed all the evidence related to the effect of alcohol on sleep architecture and the ability to form memories, we conclude that LTC W's opinion and testimony were based on sufficient facts or data. His opinion and testimony were grounded upon his extensive practice, study, and experience on the stages of sleep and the physiological effects of sleep. And his opinion and testimony were based upon his observation of LCDR LS's testimony, the review of her NCIS interview, as well as consideration of the matters addressed by the defense in cross-examination. *See United States v. Flesher,* 73 M.J. 303, 315 (C.A.A.F. 2014) (discussing that MIL. R. EVID. 703 and *Houser's* third factor allow an expert to rely on personal knowledge, assumed facts, documents supplied by other experts, or even listening to the testimony at trial when forming his or her opinion). Finally, in giving his opinion and testimony, LTC W employed the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Sanchez,* 65 M.J. at 149 (quoting *Kumho Tire Co.,* 526 U.S. at 152). The record does not support the appellant's assertion that LTC W based his opinion on his subjective personal feelings or unsupported speculation.

We conclude that there was no error, let alone plain or obvious error, in the admission of this expert testimony. This assignment of error is without merit.

b. Human lie-detector testimony

The appellant avers that LTC W provided impermissible human lie-detector testimony when he testified that the most likely reason for LCDR LS not remembering is because she was asleep. The appellant argues that this testimony did nothing more than comment on the truthfulness of LCDR LS's prior testimony. We disagree.

MIL. R. EVID. 704 states that "an [expert's] opinion or inference otherwise admissible is not objectionable just because it embraces an ultimate issue to be decided by the trier of fact." However, the expert is not permitted to express an opinion on the "ultimate issue" of a case. *United States v. Anderson,* 51 M.J. 145, 151 (C.A.A.F. 1999). Our superior court has also consistently rejected the admissibility of so-called human lie-detector testimony, which it describes as "an opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case." *United States v. Kasper,* 58 M.J. 314, 315 (C.A.A.F. 2003). An expert is also not allowed to provide an opinion that is the functional equivalent of declaring that a victim should be believed. *United States v. Birdsall,* 47 M.J. 404, 410 (C.A.A.F. 1998).

Here, the ultimate issue in this case was whether LCDR LS had been sexually assaulted by the appellant—whether she was asleep or unconscious was only one element of one of the offenses. LTC W did not express an opinion as to whether LCDR LS had been sexually assaulted by the appellant. His opinion was appropriately limited to why LCDR LS may not have had any memory of the sexual act. Nor did LTC W opine or suggest that LCDR LS should be believed. He readily admitted that there could be other explanations for her lack of memory. We conclude that LTC W's opinion was not of the human lie-detector type. Any residual concerns we may have had that the members would use LCT W's testimony as such are assuaged by the military judge's instructions to the members. The military judge instructed the members three times on how expert testimony should be received. Each time, he warned them that such testimony was a mere aid to them, and that it was their duty to determine the facts of the case and the credibility of the witnesses. "Absent evidence to the contrary, [we] may presume that members follow a military judge's instructions." *United States v. Taylor,* 53 M.J. 195, 198 (C.A.A.F. 2000) (citing *United States v. Loving,* 41 M.J. 213, 235 (C.A.A.F. 1994)) (additional citation omitted). We find nothing in the record to suggest they failed to do so.

We conclude that there was no error, let alone plain or obvious error, in the admission of this expert testimony. This assignment of error is without merit.

**C. Prosecutorial Misconduct**

The appellant complains for the first time on appeal that government counsel committed prosecutorial misconduct during their closing and rebuttal arguments by: (1) shifting the burden of proof to appellant; (2) calling the appellant a liar and disparaging his defense; (3) interjecting their personal beliefs and opinions, arguing facts not in evidence, and misrepresenting the DNA evidence; (4) vouching for LCDR LS; and (5) asking the members to base their findings on what others would think of them.

It is a basic rule of our profession that a "prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact. The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the trier from that duty." CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION Standard 3-6.8(c) (AM. BAR ASS'N 2015).[22]

"Prosecutorial misconduct occurs when trial counsel oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (citations and internal quotation marks omitted). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics cannon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

Prosecutorial misconduct in the form of improper argument is a question of law we review *de novo. United States v. Frey,* 73 M.J. 245, 248 (C.A.A.F. 2014) (citing *United States v. Marsh*, 70 M.J. 101, 106 (C.A.A.F. 2011)). In determining whether an argument is improper, we view the argument "within the context of the entire court-martial. The focus of [the] inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)). "[I]t is improper [for this court] to 'surgically carve' out a portion of the argument with no regard to its context." *Baer,* 53 M.J. at 238.

When there is no objection to a comment made during argument, we review the argument for plain error. *United States v. Andrews*, 77 M.J. 393, 401

---

[22] *See* Judge Advocate General Instruction 5803.1E, Rule 3.8(e)(6) (20 Jan. 2015) ("To the extent consistent with these Rules, the ABA standards may be used to guide trial counsel in the prosecution of criminal cases.") (citations omitted).

(C.A.A.F. 2018). Again, plain error is "established when: (1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *Hardison*, 64 M.J. at 281. The appellant has the burden of showing all three prongs of the test are satisfied. *Bungert*, 62 M.J. at 348. We are to use the plain error doctrine "sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Causey*, 37 M.J. 308, 311 (C.M.A. 1993) (citations and internal quotation marks omitted). If improper argument is found, we will reverse "only 'when the trial counsel's comments, taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (quoting *Hornback*, 73 M.J. at 160). In evaluating counsel's argument, our decision need not depend on whether any of trial counsel's arguments were, in fact, improper if we conclude the appellant has failed to meet his burden of establishing prejudice. *United States v. Erickson,* 65 M.J. 221, 223-24 (C.A.A.F. 2007). To determine whether a counsel's inappropriate comments rise to this level we consider: (1) the severity of the misconduct; (2) any curative measures taken; and (3) the strength of the government's case. *United States v. Fletcher,* 62 M.J. 175, 184 (C.A.A.F. 2005).

> Indicators of severity include (1) the raw numbers—the instances of misconduct as compared to the overall length of the argument; (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations; and (5) whether the trial counsel abided by any rulings from the military judge.

*Id.* (citation omitted).

### 1. Burden shifting

In a criminal prosecution, the Due Process Clause of the Fifth Amendment establishes that "the government must prove a defendant's guilt beyond a reasonable doubt." *United States v. Lewis,* 69 M.J. 379, 383 (C.A.A.F. 2011) (citing *United States v. Czekala*, 42 M.J. 168, 170 (C.A.A.F. 1995)). This burden never shifts to the defense. Any suggestion in argument that an accused may have an obligation to produce evidence of his or her own innocence is "error of constitutional dimension." *United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004). However, "[a] constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the [members] naturally and necessarily would interpret the summation as comment on the failure of the accused to testify." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citations and internal quotation marks omitted). Additionally, "[u]nder the invited response or invited

reply doctrine, the prosecution is not prohibited from offering a comment that provides a fair response to claims made by the defense." *Id.* (citations and internal quotation marks omitted).

The appellant now avers that by arguing that the members had heard no evidence of consent, flirting, or interaction between the appellant and LCDR LS, the trial counsel shifted the burden to him to prove that LCDR LS did consent or that he reasonably believed she consented. We disagree.

The offenses with which the appellant was charged required the government to prove beyond a reasonable doubt that LCDR LS either did not consent to the charged sexual act and bodily harm, or that she was incapable of giving consent because she was asleep or unconscious at the time of the sexual act. Additionally, because some evidence at trial had raised the possibility that the appellant may have been mistaken as to LCDR LS's consent, the government was also required to prove beyond a reasonable doubt that any mistake of fact as to LCDR LS's consent held by the appellant was not reasonable.

At trial, the military judge properly instructed the members that: (1) the law presumes the appellant to be innocent of the charges against him; (2) when there is inconsistency between what the counsel say regarding the instructions on the law and the court's instructions, the members must follow the court's instructions; and (3) the burden of proof to establish the appellant's guilt is on the government and that burden never shifts to the appellant to establish his innocence or to disprove any fact necessary to establish an element of an offense.

The trial counsel pointed out the absence of evidence of consent or mistake of fact as to consent. Neither the appellant nor LCDR LS were alone on the night in question. Trial counsel was, therefore, not commenting on matters that would necessarily have to have been introduced by the appellant. Testimony embracing the issues of consent and mistake of fact as to consent was elicited by both the government and the defense when questioning LCDR LS and other witnesses about LCDR LS's and the appellant's actions and behaviors before, during, and immediately after the sexual acts at issue. Thus, the absence of evidence of consent, and evidence that would support a reasonable mistake of fact as to consent argued by the trial counsel were not such that the appellant alone would be in possession of "the information to contradict the government evidence referred to." *Carter,* 61 M.J. at 33. (citations omitted). Additionally, trial counsel's comments were in line with the military judge's instructions on consent, mistake of fact as to consent, and reasonable doubt.

Further, we are not persuaded that the members would "interpret the summation as comment on the failure of the [appellant] to testify." *Id.* at 33

(citations and internal quotation marks omitted). Trial counsel's argument addressed the evidence raised through the examination of numerous government and defense witnesses who provided extensive testimony of their observations of LCDR LS and the appellant. The record does not support the appellant's contention that the government shifted the burden of proof to him to prove his innocence.

### 2. *Calling the appellant a liar and disparaging his defense*

#### a. Calling the appellant a liar

Calling the appellant a liar is "a dangerous practice that should be avoided." *Fletcher,* 62 M.J. at 182 (citation and internal quotation marks omitted). Trial counsel are expected to "comment on . . . conflicting testimony" in closing argument without using "language that [i]s more of a personal attack on the defendant than a commentary on the evidence." *Id.*, at 183.

However, describing a defendant as a liar does not equate to per se error.[23] Additionally, trial counsel are permitted to "forcefully assert reasonable inferences from the evidence." *United States v. Coble,* No. 201600130, 2017 CCA LEXIS 113, \*10 (N-M. Ct. Crim. App. 23 Feb 2017) (unpub. op.) (quoting *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008)). But, there is an "exceedingly fine line which distinguishes permissible advocacy from improper excess" when commenting on the credibility of an accused. *Fletcher*, 62 M.J. at 182-83 (citations and internal quotation marks omitted). One factor in determining if the trial counsel has crossed this line is whether the trial counsel ties the comment to evidence in the record. Where the trial counsel has "explained why the jury should come to th[e] conclusion" that the appellant lacks credibility, the Court may find permissible advocacy. *Cristini*, 526 F.3d at 902. If, however, the trial counsel's statements are "unsupported by any rational justification other than an assumption that [the appellant] was guilty," and "not coupled with a more detailed analysis of the evidence adduced at trial," the comments turn improper. *Hodge v. Hurley,* 426 F.3d 368, 378 (6th Cir. 2005). These untethered assertions "convey an impression to the jury that they should simply trust the [government's] judgment" that the accused is guilty because the trial counsel "knows something [the jury] do[es] not." *Id.*

Here, the appellant did not testify at trial. During his rebuttal argument, after observing that one of the defense's theories was that LCDR LS lied

---

[23] *See, e.g., Fletcher,* 62 M.J. at 182-83 (finding trial counsel's comments that Fletcher's testimony "was the first lie," that he "had 'zero credibility' and that his testimony was 'utterly unbelievable'" were "not so obviously improper as to merit relief in the absence of an objection from counsel.").

about not being able to remember the sexual act because she was asleep, trial counsel argued, "[w]hat does it mean when somebody says, 'I've just given her water['] when their DNA is inside someone's vagina? It means they are lying."[24] Despite the appellant's claim, the trial counsel never called the appellant a liar. Although the trial counsel did characterize the appellant's oft-repeated out-of-court explanation as a lie, in doing so the trial counsel explained, based upon the evidence before them, why the members should come to the conclusion that the appellant's statement lacked credibility.

We conclude, therefore, that the trial counsel's comments do not constitute error because he "avoided characterizing [the appellant] as a liar" and the comment reasonably questioned "the plausibility of [the appellant's] story." *Fletcher,* 62 M.J. at 183. It was not a personal attack on the appellant.

### b. Disparaging the defense

It is also "improper for a trial counsel to attempt to win favor with the members by maligning defense counsel." *Id.* at 181 (citations omitted). Doing so detracts from the dignity of the proceedings and has the potential to turn the court-martial into "a popularity contest" with the members deciding the case, not on the facts and law of the case, but "based on which lawyer they like better." *Id.*

In addition to "detract[ing] from the dignity of judicial proceedings[,]" personal attacks can "cause the [trier of fact] to believe that the defense's characterization of the evidence should not be trusted, and, therefore, that a finding of not guilty would be in conflict with the facts of the case." *United States v. Xiong,* 262 F.3d 672, 675 (7th Cir. 2001). This violates the core legal standard of criminal proceedings, that the government always bears the burden of proof to produce evidence on every element and persuade the members of guilt beyond a reasonable doubt. *Czekala,* 42 M.J. at 170; RULE FOR COURTS-MARTIAL (R.C.M.) 920(e)(5)(D), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). However, a trial counsel is permitted to make "a fair response" to claims made by the defense. *United States v. Gilley*, 56 M.J. 113, 120 (C.A.A.F. 2001) (quoting *United States v. Robinson,* 485 U.S. 25, 32 (1988)).

Here, the appellant asserts that the trial counsel's argument disparaged the defense by characterizing the defense efforts as attempts to distract the members from the facts of the case, and referring to the defense theories as fanciful, a neat trick, and ridiculous. We disagree. These statements permissibly address the multiple theories of reasonable doubt offered by the defense

---

[24] Record at 1170.

by arguing the implausibility of the appellant's version of the facts. Additionally, when considering the full context of the argument, the trial counsel made these statements while explicitly reminding the members that the defense did not have the burden of proof: "Now defense does not have to put on any case at all. We have the burden of proof, but when they say ridiculous things like this, we can kick the tires on it, okay."[25]

We conclude that trial counsel's comments about the defense did not shift the burden of proof, nor do they rise to the level of prosecutorial misconduct.

*3. Interjecting trial counsel's opinion or belief, arguing facts not in evidence, and misrepresenting the DNA evidence*

Arguments of counsel are not evidence. *Fletcher,* 62 M.J. at 183 (citation omitted). Despite arguments not being evidence, counsel are still not allowed to argue "material misstatements of fact." *Davis v. Zant,* 36 F.3d 1538, 1548 n.15 (11th Cir. 1994 (citation omitted). In making argument, a prosecutor "may strike hard blows," but may not "strike foul ones." *Berger*, 295 U.S. at 88. They are permitted to "argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Cristini*, 526 F.3d at 901. But the prosecutor must not express a "personal belief or opinion as to the truth or falsity of any testimony or evidence. Such beliefs or opinions are merely a form of unsworn, unchecked testimony." *United States v. Horn*, 9 M.J. 429, 430 (C.M.A. 1980) (citation and internal quotation marks omitted). "[A] court-martial must reach a decision based only on the facts in evidence." *Fletcher*, 62 M.J. at 183 (citation omitted). However, counsel are permitted to comment during argument "on contemporary history or matters of common knowledge . . . [of] which men in general have a common fund of experience and knowledge, through data notoriously accepted by all." *Id.* (citations and internal quotation marks omitted).

### a. Interjecting personal opinion or belief

The appellant asserts that trial counsel's argument that LCDR LS was not facing an investigation for a false report of sexual assault constituted an impermissible personal opinion or belief. We disagree. Our review of the record reveals that through the cross-examination of LCDR LS, the appellant's trial defense counsel had introduced the theory that LCDR LS may have lied about being sexually assaulted to avoid disciplinary action for having a sexual relationship with a junior officer—and later argued the avoidance of disci-

---

[25] Record at 1164.

plinary action as a motive for her to fabricate the claim of sexual assault.[26] We find that the comments complained of here were not such that they were "unsworn, unchecked testimony." *Horn,* at 430. Instead, the comments were fair responses to the defense claim that LCDR LS had lied about being sexually assaulted to avoid disciplinary action.

### b. Arguing facts not in evidence

The appellant asserts that counsel's comments that women and men who engage in consensual sexual encounters do not act as LCDR LS and the appellant acted in the immediate aftermath of that encounter is error. He also asserts that it is error for trial counsel to argue how a person may act in an alcohol induced blackout. He argues this is error because these comments were unsupported by the record. The appellant further complains the trial counsel urged the members to substitute their common sense and knowledge of the ways of the world for evidence. We disagree.

"As case law and the Military Judge's Benchbook have long recognized, members are expected to use their common sense in assessing the credibility of testimony as well as other evidence presented at trial." *United States v. Frey*, 73 M.J. 245, 250 (C.A.A.F. 2014) (citations omitted). Here, the military judge properly instructed the members that they were permitted and expected to use their common sense and knowledge of the ways of the world in evaluating the testimony and evidence before them.

The comments at issue were made by government counsel when discussing the testimonial evidence presented on LCDR LS's and the appellant's demeanor, statements, actions, and reactions in the immediate aftermath of the assault, and after the members had heard expert testimony concerning the impact of alcohol on memory formation. Additionally, all members were married and would have a common fund of experience and knowledge on the reactions of men and women to consensual sexual encounters. When viewed in context of the entire argument, the evidence presented at trial, and the military judge's instructions, the comments were not a request by government counsel for the members to substitute their common sense and knowledge of the ways of the world for evidence, but a reminder to the members that they should use their common sense and knowledge in evaluating the credibility of the evidence on the issues before of them.

---

[26] We also observe that during voir dire, trial defense counsel also questioned the members regarding whether they believed a person alleging a sexual assault may have falsely done so to avoid disciplinary action. *See* Record at 284.

c. Misrepresenting the DNA evidence

The appellant also complains that government counsel misrepresented the DNA evidence by arguing the combination of the male DNA found in LCDR LS's vaginal canal, and the appellant's DNA found inside her vulva proved penetration of LCDR LS's vulva by the appellant. The appellant argues that this argument is a misrepresentation of the DNA evidence because: (1) Mr. T testified that there was no way to definitively determine how the male DNA ended up in LCDR LS's vaginal canal; (2) the male DNA found inside LCDR LS's vulva did not match the appellant's, only that it included him as one of many possible contributors; and (3) that penetration was unsupported by the evidence presented. We disagree.

We conclude that the comments are not a misrepresentation of the DNA evidence, but are reasonable inferences from the evidence of record. First, Mr. T testified that, although he could not say definitively how it got there, the male DNA found in LCDR LS's vaginal canal was found in a location where male DNA did not just suddenly or spontaneously appear, and there must be some form of penetration for the male DNA to be in that location. Second, Mr. T testified that the male DNA found on the inside of LCDR LS's vulva—between the lips of the vulva—was 18 times more likely to be the appellant's or one of his paternal male relatives than from a randomly selected male. And third, although he acknowledged there were other explanations for how the male DNA—including the male DNA for which the appellant was a possible contributor—arrived at its ultimate destination, Mr. T confirmed that his findings were consistent with penetration of the vulva.

*4. Vouching*

It is well-established that it is the "exclusive province of the court members to determine the credibility of witnesses." *United States v. Knapp*, 73 M.J. 33, 34 (C.A.A.F. 2014) (citation and internal quotation marks omitted). To protect the integrity of this province, the "[trial counsel] should not imply special or secret knowledge of the truth or of witness credibility, because when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore that witness' views." *United States v. Andrews,* No. 201600208, 2017 CCA LEXIS 283, at *23 (N-M. Ct. Crim. App. 27 Apr 2017) (unpub. op.) (citations and internal quotation marks omitted) *aff'd,* 77 M.J. 393 (C.A.A.F. 2018). Thus, "[i]mproper vouching occurs when the trial counsel places the prestige of the government behind a witness through personal assurances of the witness's veracity." *Fletcher*, 62 M.J. at 180 (citation and internal quotation marks omitted).

Closing arguments and rebuttal "may properly include reasonable comment on the evidence in the case, including references to be drawn therefrom,

in support of a party's theory of the case." R.C.M. 919(b). Specifically, government counsel may "comment about the testimony, conduct, motives, interests, and biases of witnesses to the extent supported by evidence." R.C.M. 919(b), Discussion. Thus, it is not improper for trial counsel to "argu[e]," while "marshall[ing] evidence," that a witness "testified truthfully," particularly after the defense "vigorously attacked" the witness's "testimony." *United States v. Chisum,* 75 M.J. 943, 953 (A.F. Ct. Crim. App. 2016).

The appellant asserts trial counsel improperly vouched for LCDR LS by characterizing the notion that she consented as ridiculous, stating she was never impeached, and never shaded her testimony to help the case. By doing so, he argues the trial counsel placed the weight of the government behind LCDR LS.

When viewed in context, the complained-of comments by trial counsel were made following the civilian defense counsel's lengthy closing argument in which he repeatedly attacked LCDR LS's credibility for having claimed no memory of the sexual acts at issue. Indeed the defense counsel first argued that LCDR LS was not being truthful[27] and that her claims "just aren't true."[28] As the Supreme Court has said, "it is important that both the defendant and prosecutor have the opportunity to meet fairly the evidence and arguments of one another." *United States v. Robinson,* 485 U.S. 25, 33 (1988). Here, the trial counsel forcefully argued the facts in evidence and fair inferences therefrom that supported and corroborated LCDR LS's claim of lack of consent, inability to give consent, and inability to remember.

*5. Asking the members to base their findings on what people would think of them.*

The appellant urges this court to conclude that trial counsel's argument commanded the members to base their findings not on the evidence and the instructions of the military judge, but on what others would think of them. We decline to do so.

It is the duty of a court-martial member to determine whether an accused has been proven guilty of an offense based on the evidence presented at trial and in accordance with the instructions provided by the military judge. R.C.M. 502(a)(2). Here, the military judge emphasized this duty when he instructed the members that it was his duty as the military judge to instruct them on the law and it was their duty as members to determine the facts,

---

[27] Record at 1117, 1124, and 1125.

[28] *Id.* at 1131.

and—after applying the law to the facts—determine the guilt or innocence of the appellant.[29] The military judge further instructed the members that "it is [their] duty under the law to reach [their] own determination as to whether the [appellant] is guilty or not guilty, and that determination may not be influenced by the views of *any* person *outside the deliberation room*."[30]

In the complained-of comments, the trial counsel imagined a hypothetical discussion. This hypothetical discussion takes place after the court-martial has concluded and is between the member and his or her spouse or loved one—someone the member would consider a reasonable person. In that discussion the member tells another person that he *was* a member of a court-martial. When asked what the court-martial was about, the member explains that it was about a guy who walked into a room at 0400 and sees a woman he barely knows and puts his finger and penis inside of her. The guy's DNA is found inside the woman and her DNA is on his penis. The hypothetical discussion ends with the other person asking the member "[w]hat do you think happened?"[31] The trial counsel then answers the ending question by arguing, "It sounds like a sexual assault, and it sounds like that because that's what happened."[32] Although poorly contrived, the hypothetical was nothing more than a simplified summary of the facts before the members. When considered in context, the trial counsel's comments were aimed at showing the members why they should find that the government's version of the facts—that the appellant had sexually assaulted LCDR LS—was objectively reasonable, and the appellant's version of the facts—that LCDR LS had consented to the sexual acts or the appellant reasonably believed that she had consented—was objectively unreasonable.

We find no support in the record for the appellant's assertion that the trial counsel asked or "command[ed]"[33] the members to base their decision on what others may think of them. In the absence of evidence to the contrary, we presume the members followed the instructions of the military judge that it was their duty, and their duty alone, to determine the guilt or innocence of the appellant based on the evidence presented at trial. *Taylor,* 53 M.J. at 198 (citations omitted). We find no error, plain or otherwise, in the complained-of comments.

---

[29] Record at 1035.

[30] *Id.* at 1036 (emphasis added).

[31] *Id.* at 1143-44.

[32] *Id.* at 1144.

[33] Appellant's Reply Brief of 25 Jun. 2018 at 12.

To summarize our assessment of the alleged prosecutorial misconduct—we do not find legal error in the trial counsel's closing or rebuttal arguments where, as here, the counsel zealously responded to the defense's multiple theories of the case and assertions and implications made throughout the trial and closing argument. Although at times trial counsel's argument to the members was not artfully expressed, we do not find it to be "undignified and intemperate, containing improper insinuations and assertions calculated to mislead the [finder of fact]." *Berger*, 295 U.S. at 85.

## D. Admitting testimony of LCDR LS's demeanor and BAC

The appellant asserts that it was error for the military judge to admit into evidence—over defense objection—testimony concerning LCDR LS's demeanor during her sexual assault forensic examination, and testimony concerning LCDR LS's BAC. We disagree.

MIL. R. EVID. 401 defines "relevant evidence" as "evidence having any tendency to make a fact of consequence "more or less probable than it would be without the evidence." As a general rule, a party has a right to have admitted "all relevant evidence"; on the other hand, "evidence which is not relevant is not admissible." MIL. R. EVID. 402. Under MIL. R. EVID. 403, a military judge may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." We review a military judge's rulings on the admissibility of evidence for "abuse of discretion." *United States v. Richards*, 76 M.J. 365, 369 (C.A.A.F. 2017). "An abuse of discretion occurs when we determine that the military judge's findings of fact are clearly erroneous or that he misapprehends the law." *Richards*, 76 M.J. at 369 (quoting *United States v. Clayton*, 68 M.J. 419, 423 (C.A.A.F. 2010)). We accord military judges "'wide discretion' when applying MIL. R. EVID. 403." *United States v. Mann*, 54 M.J. 164, 166 (C.A.A.F. 2000) (quoting *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995). Absent a "clear abuse of discretion," if the military judge "conducts a proper balancing test under [MIL. R. EVID.] 403, the ruling will not be overturned." *Mann*, 54 M.J. at 166. However, if he fails to articulate his analysis on the record he receives less deference, and no deference if no balancing test is conducted. *Id.*

### 1. Lay opinion testimony concerning LCDR LS's demeanor

The appellant complains that it was error for the military judge to admit lay opinion testimony describing LCDR LS's demeanor as very emotional and distraught during her SAFE because the testimony was irrelevant, an improper lay opinion, and unfairly prejudicial. We disagree.

"Lay opinion testimony is only admissible if (1) the opinion is rationally based on the witness's perception; and (2) the opinion is helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue." *United States v. Lopez*, 76 M.J. 151, 156 (C.A.A.F. 2017) (citations and internal quotation marks omitted). However, "[s]o long as the opinion [of a lay witness] is based upon personal observation and is relevant, [the witness] may testify about another's emotional state. No unique ability or specialized training is required to form such opinions." *United States v. Roberson*, 65 M.J. 43, 47 (C.A.A.F. 2007) (citations omitted).

The lay opinion testimony at issue was provided by LCDR H, a nurse who assisted in the SAFE of LCDR LS. Before trial, the defense raised a motion to suppress LCDR H's testimony concerning LCDR LS's demeanor during her SAFE. The military judge denied the motion, finding the demeanor testimony was admissible. In this instance, because the military judge articulated his analysis—to include his balancing analysis—on the record, we accord his decision great deference. *Manns,* 54 M.J. at 166. We will only overturn his decision if we conclude that his findings were clearly erroneous or that he misapprehended the law.

LCDR LS arrived at the medical treatment facility around 0600, approximately two hours after the sexual assault. LCDR H testified that she personally observed LCDR LS's demeanor when she arrived at the treatment facility. She described LCDR LS's demeanor as "very emotional . . . she did not want to talk to anyone, very, very, very upset and distraught."[34] In overruling the defense objection to this testimony, the military judge found that LCDR H's opinion was based on her personal observations of LCDR LS; that the testimony was of "some limited probative value; that it would be helpful to the finder of fact in that it tend[s] to corroborate that a traumatic event had occurred to the complaining witness[; and] . . . it makes it somewhat more likely to conclude that an assault had occurred."[35] In articulating his balancing analysis the military judge stated, "I find that while [the demeanor] evidence is not good for the defense, I don't find that it's unfairly prejudicial and I don't find that it's going to confuse the issues and mislead the members or cause any undue delay."[36]

We find that the military judge's findings of fact are supported by the record and that he appropriately applied the law. LCDR H personally observed

---

[34] Record at 858.

[35] *Id*. at 240.

[36] *Id*.

LCDR LS and thus had a basis for describing how she appeared. As the record reflects, after arriving at the treatment facility it was over four hours before LCDR LS had calmed down sufficiently to conduct the examination. The testimony provided by LCDR H describing LCDR LS's demeanor was just that—a description. It did not consist of any explanation of why LCDR LS may have had that demeanor or any inappropriate human lie-detector type statements suggesting LCDR H believed that LCDR LS's demeanor was consistent with one who had experienced a previous sexual assault. *See Lopez,* 76 M.J. at 155 (describing human lie-detector testimony as "testimony that leads the members to infer that the witness believes the victim is truthful or deceitful with respect to an issue at trial.") (citations omitted). LCDR LS's demeanor was relevant and probative in that it could assist the trier of fact in determining a fact at issue in the case—whether LCDR LS had recently experienced a traumatic event—the sexual assault. Finally, we find no support in the record to conclude that the demeanor testimony's probative value was substantially outweighed by any danger of unfair prejudice, confusion of the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence. MIL. R. EVID. 403.

### 2. Testimony regarding LCDR LS's BAC

The appellant also complains that it was error for the military judge to admit testimony concerning LCDR LS's BAC, alleging that this testimony was confusing, unfairly prejudicial, and not relevant. We disagree.

Before trial, the appellant filed a motion *in limine* seeking to prevent the government from offering evidence of LCDR LS's BAC.[37] After receiving evidence on the motion—including testimony from both the government's and defense's sleep disorder experts regarding how LCDR LS's BAC may have affected her sleep and ability to be awakened by external stimuli—and argument from counsel, the military judge allowed the government to present the BAC testimony. In articulating his ruling on the motion, the military judge stated that LCDR LS's BAC at both "the time of the draw and the time of the alleged [sexual assault]" was "minimally probative . . . in proving that [LCDR LS] had alcohol in her system at the time of the [sexual assault]."[38] Citing MIL. R. EVID. 401 and 402, the military judge went on to articulate "the BAC reading of .1 is minimally relevant, but it confirms that the victim had consumed alcohol and the regression result of .18 to .22 provides at least some evidence as to the victim's level of blood alcohol at the time of the inci-

---

[37] *See* AE IX.

[38] Record at 233.

dent."[39] Concerned that the members may attempt to use the BAC as "short-hand for determining that the victim was unconscious or asleep[,]"[40] the military judge *sua sponte* alerted counsel that he would be giving the members a cautionary instruction on the permissible uses of the BAC evidence.[41] After receiving the instruction, all members affirmed that they understood and would follow the instruction. The military judge then repeated this instruction to the members during his findings instructions.

Here, although the military judge's "minimally probative" comment and his *sua sponte* decision to provide a cautionary instruction suggests that he may have done a MIL. R. EVID. 403 balancing analysis, we cannot be certain that he did so. Accordingly, we have examined the record for ourselves. *Manns,* 54 M.J. at 166.

We find that LCDR LS's BAC at the time of the blood draw and at the time of the sexual assault was relevant in that it had the tendency to make a fact in consequence—that LCDR LS could not consent because she was asleep at the time of the sexual assault—"more probable than it would be without the evidence." MIL. R. EVID. 401 and 402. First, it established that at the time of the draw, LCDR LS had alcohol in her system and at what level. By using this known concentration, through the use of regression analysis, LCDR LS's BAC could be estimated at the time of the sexual assault. A person's BAC is, as explained by the government's sleep disorder expert, LTC W, "the best tool we have at looking at how to match up one individual with what the evidence or science has shown to be true regarding physiology and [the effect of] alcohol on physiology"[42]—to include its effect on sleep.[43] As both the government's

---

[39] *Id.* at 234.

[40] *Id.* at 235.

[41] Before the testimony of the government's forensic toxicologist, the military judge gave the following instruction:

> Members, before we call this next witness, I'm going to advise you that you are going to hear evidence about the BAC of [LCDR LS] during this next witness's testimony. You may consider this along with all other evidence in this case but you must set aside anything you know about the laws concerning driving under the influence. Those laws have no bearing on your evaluation of this evidence. Under the law, one may be too intoxicated to drive, but not incompetent for other purposes, including to consent to sexual activity. Simply knowing an individual's BAC does not in and of itself establish that individual's level of impairment.

*Id.* at 863.

[42] Record at 206.

and the defense's experts testified, alcohol—and the amount of alcohol in a person's system—can make it more difficult for a person to be awakened by external stimuli. Hence, we conclude that the BAC testimony had probative value in that it could be helpful to the members in understanding how the amount of alcohol LCDR LS had in her system at the time of the incident impacted her ability to respond to external stimuli—the assault—if she were, in fact, asleep at the time.

Having found that the testimony was relevant and probative, we now examine whether the probative value of the testimony was substantially outweighed by confusion of the issues or unfairly prejudicial to the appellant. MIL. R. EVID. 403. We find that it was not.

The BAC testimony did not confuse the issues. The issue was what impact the alcohol in LCDR LS's system had on her sleep and her ability to be awakened from that sleep by the sexual acts—not whether LCDR LS was substantially incapacitated to the point of being incapable of giving consent to the sexual acts. Furthermore, we find that the probative value was not substantially outweighed by any unfair prejudice. As the military judge did at trial, we too recognize the danger that the members may have used the BAC as short-hand to find that LCDR LS was asleep or unconscious. The military judge's instruction to the members on this issue properly focused them on the issue for which it was presented and argued. In the absence of evidence in the record to the contrary, we presume the members to have followed the military judge's instructions. *Taylor,* 53 M.J. at 198 (citations omitted). Finally, although not raised by the appellant, we also find no reason in the record to believe that the probative value of the testimony was substantially outweighed by any other MIL. R. EVID. 403 consideration.

## E. Legal and factual sufficiency

We review questions of legal and factual sufficiency *de novo.* Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

---

[43] *Id.* at 198.

The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The appellant challenges the legal and factual sufficiency of his convictions, asserting that the evidence fails to prove: (1) the appellant penetrated LCDR LS's vulva with his finger; or (2) that LCDR LS was asleep or unconscious at the time.

### 1. Penetration of the vulva

The statutory elements of sexual assault by bodily harm are: (1) a person commits a sexual act upon another person; and (2) the person did so by causing bodily harm to that other person. Art. 120(b)(1)(B), UCMJ. "Sexual act" is defined, in pertinent part, as "the penetration, however slight, of the vulva . . . of another by any part of the body . . . with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person." Art. 120(g)(1)(B), UCMJ. "Bodily harm" is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." Art. 120(g)(3), UCMJ. "Consent" is "a freely given agreement to the conduct at issue by a competent person." Art. 120(g)(8)(A), UCMJ. A sleeping or unconscious person "cannot consent." Art. 120(g)(8)(B), UCMJ. "Lack of consent may be inferred based on the circumstances of the offense." Art. 120(g)(8)(C), UCMJ. Although not defined by the statute, the military judge used the Military Judges' Benchbook to define the vulva as the "external genital organs of the female, including the entrance of the vagina and the labia majora and labia minora. 'Labia' is the Latin and medically correct term for 'lips.'"[44]

Here, the sexual act and bodily harm alleged are the same—penetration of LCDR LS's vulva by the appellant's finger.

LCDR LS testified that she recalled awakening to the appellant touching her vagina with his fingers, although she did not remember any penetration

---

[44] Military Judgs' Benchbook, Dept. of the Army Pamphlet 27-9 at ¶ 3-45-14 (10 Sept 2014). *See also* Record at 138.

of her vagina.[45] She also testified that when she realized what was happening she tried to get away from the appellant telling him to "[s]tay away from me" and asking "[w]hy did you do that?"[46] LCDR LS was adamant that she did not consent to any sexual activity with the appellant. Her squadron mates throughout the multiple rooms in the quiet admin testified they awoke to LCDR LS crying, and raising her voice to the point of screaming. She was heard saying as she distanced herself from the appellant: "[g]et him away from me," and "[w]hat are you doing?"[47] LT AT testified he saw the appellant get off the roll-away bed and "fix[] his pants" while LCDR LS got up and ran to the corner screaming and sobbing.[48]

Within hours of the sexual contact, LCDR LS and the appellant both completed SAFEs. During LCDR LS's SAFE examination, the examiner obtained "[external] vaginal swabs," swabbing in between the labia major and labia minor, and then inside the labia minor, which included "inside the lips of the vagina—inside the lips of the vulva."[49] The examiner then took "internal vaginal swabs" from inside the vaginal canal. The forensic biologist who examined the samples testified that the external swabs taken from inside the "lips" of the vulva, revealed a partial male DNA profile that matched appellant's profile.[50] He testified that "this profile is 18 times more likely to have occurred if it originated from [appellant] or a paternal male relative than if it originated from a randomly selected individual."[51] Though these swabs are described as "external" swabs, because they were taken outside the vaginal canal, but within the lips of the vulva, the record establishes they were obtained from areas inside LCDR LS's vulva.[52]

The appellant focuses his argument on the issue of proof of penetration. He asserts the record does not support, legally or factually, the members' finding that the appellant penetrated LCDR LS's vulva with his finger. The

---

[45] We again note that throughout trial, the counsel and LCDR LS used the term vagina, and not vulva. The vagina is "the canal in the female, extending from the vulva to the cervix uteri, which receives the penis in copulation. Slone, *The Slone-Dorland Annotated Medical-Legal Dictionary,* at 764.

[46] Record at 476.

[47] *Id.* at 703.

[48] *Id.* at 628-631.

[49] *Id.* at 885-887.

[50] *Id.* at 924.

[51] *Id.* at 924.

[52] *Id.* at 887

appellant points to LCDR LS's testimony at trial that she only remembered the appellant touching her vagina, not penetrating it, and to the location of and quality of the male DNA that was found on swabs taken during LCDR LS's sexual assault exam. We disagree.

Proof beyond a reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001). "The factfinders may believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979). So too may this court. *United States v. Diaz*, 61 M.J. 594, 599 (N-M. Ct. Crim. App. 2005), *aff'd*, 64 M.J. 176 (C.A.A.F. 2006). "When weighing the credibility of a witness, this court, like a fact finder at trial, examines whether discrepancies in witness testimony resulted from an innocent mistake, such as a lapse of memory, or a deliberate lie." *United States v. Berger*, No. 201500024, 2016 CCA LEXIS 322, at *36 (N-M. Ct. Crim. App. May 26, 2016), *rev'd on other grounds*, 76 M.J. 128 (C.A.A.F. 2017).

Although LCDR LS testified that she did not remember any penetration of her vagina, she did state that she remembered the appellant touching her vagina. She also repeatedly stated that she had not consented to any sexual conduct with the appellant. Further she testified that she had no memory of anything from the time she fell asleep until she was awakened by the appellant touching her vagina because she was asleep. We find her testimony, to be credible, consistent even through the crucible of cross-examination, and corroborated or supported by other witnesses, the forensic evidence, and the surrounding circumstances. Finally, although "18 times more likely" is not an overwhelming statistic, the appellant was included as a possible contributor to the DNA found in LCDR LS's vulva.

After reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are convinced that a reasonable fact-finder could have been convinced beyond a reasonable doubt that the appellant sexually assaulted LCDR LS by penetrating her vulva with his finger without her consent. Furthermore, after weighing the evidence in the record and making allowances for not having personally observed the witnesses, we too are convinced beyond a reasonable doubt.

### 2. Asleep or unconscious

While this court is not required to address the evidence pertaining to the specification that was conditionally dismissed—that LCDR LS was incapable of consenting to the sexual act because she was asleep or unconscious—we also find the evidence in support of this offense legally and factually sufficient. LCDR LS testified she was asleep. Numerous witnesses confirmed she

was asleep, and the expert testimony provided by LTC W, the government's sleep expert, corroborated her testimony.

## F. Ineffective assistance of counsel

The appellant claims his trial defense counsel were ineffective because they failed to present evidence of his BAC level in order to negate the specific intent required to commit the offenses alleged. We review claims of ineffective assistance of counsel *de novo*. *United States v. Harpole,* 77 M.J. 231, 236 (C.A.A.F. 2018) (citations omitted). The Sixth Amendment entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice. *Id.* at 687.

With respect to *Strickland's* first prong, counsel are presumed to be competent and our inquiry into an attorney's representation is "highly deferential." *Id.* at 689. We employ "a strong presumption that counsel's conduct falls within the wide range of professionally competent assistance." *Id.* The appellant has the heavy burden of establishing a factual foundation for a claim of ineffective representation. *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000). We will not second-guess strategic or tactical decisions made by the trial defense counsel unless the appellant can show specific defects in counsel's performance that were unreasonable under prevailing professional norms. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009).

In order to show prejudice under *Strickland's* second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

We need not, however, "determine whether counsel's performance was deficient before examining the prejudice suffered by the [appellant] as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Assuming without deciding that trial defense counsel's failure to present evidence of the appellant's BAC on the merits was deficient performance, we turn to the prejudice component of the test for ineffective assistance—is there a reasonable probability that, had trial defense counsel presented evidence of

the appellant's specific BAC on the merits, the outcome of his trial would have been different? We find that it would not.

Our review of the record reveals evidence of the appellant's consumption of alcohol and visible degree of impairment had been raised at trial. Multiple witnesses testified that they observed the appellant consuming alcohol throughout the day and evening in question—to include observing him drinking at the hotel pool, restaurant, command social, and later playing drinking games in the party admin. Specifically regarding the appellant's degree of impairment, after several witnesses testified about playing drinking games and LCDR LS's lack of any visible impairment after participating in those games, a panel member asked, "was [the appellant] excessively drunk?"[53]—to which the witness responded, "[h]e was another person that I was worried about," suggesting that the appellant was more visibly impaired than LCDR LS from the consumption of alcohol.[54] In light of this evidence, the military judge properly instructed the members on the issue of voluntary intoxication, and to the offenses to which it applied.[55] Had the appellant's BAC been admitted on the merits, these instructions would have remained substantially unchanged.

Additionally, even if the appellant's specific BAC had been admitted on the merits, the evidence before the members of the appellant's conduct would have remained unchanged. We find the appellant's conduct was "sufficiently focused and directed so as to amply demonstrate" his specific intent. He entered the room, slipped into bed beside LCDR LS, spooning her, pulled her underwear and shorts down, and penetrated her vulva with his finger. When confronted by LCDR LS, he helped her pull up her underwear, got off the bed, fastened his pants, and then vigorously denied LCDR LS's claims of sexual assault by counter-claiming he was just trying to get her water, and later told one of his squadron mates, "something happened that shouldn't have, but [I] didn't do nothing [sic] wrong."[56]

Finally, the government's evidence was strong. DNA evidence consistent with that of the appellant's was found inside LCDR LS's vulva. LCDR LS testified that she was asleep on the roll-away bed at the time of the assault and in no way consented to the sexual acts. Multiple witnesses testified they saw LCDR LS sleeping on the bed. LCDR LS was also observed getting off the bed

---

[53] Record at 999; AE LXXVI.

[54] *Id.* at 999.

[55] *Id.* at 1048-49 and 1055-56; R.C.M. 916(l)(2).

[56] Record at 766.

in a hysterical state, trying to get away from the appellant, and screaming that he had just sexually assaulted her.

Finding no reasonable probability of a different outcome, the appellant was not prejudiced by his counsel's failure to admit his BAC on the merits. *Strickland,* 466 U.S. at 694.

## G. Sentence appropriateness

The appellant contends that the mandatory minimum sentence of a dismissal imposed in his case is inappropriately severe. We find that it is not.

We review sentence appropriateness *de novo. United States v. Lane,* 64 M.J. 1, 2 (C.A.A.F. 2006). This court "may affirm only . . . the sentence or such part or amount of the sentence, as it . . . determines, on the basis of the entire record, should be approved." Art. 66(c), UCMJ. "Sentence appropriateness involves the judicial function of assuring justice is done and that the accused gets the punishment he deserves." *United States v. Healy,* 26 M.J. 395, 395 (C.M.A. 1988). Assessing sentence appropriateness requires "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted). Despite our significant discretion in reviewing the appropriateness and severity of an adjudged sentence, we cannot engage in acts of clemency. *United States v. Nerad,* 69 M.J. 138, 146 (C.A.A.F. 2010).

The appellant stands convicted of having sexually assaulted a more senior officer while forward deployed for combat operations. At the time of his misconduct, the appellant had nearly eight years of honorable service to his credit. Included in his honorable service were numerous awards, accolades, and positive fitness reports. Having given individualized consideration to the appellant, the nature and seriousness of his offenses, his character, record of service, and all other matters contained in the record of trial, we find that the sentence adjudged by the members in this case—a reprimand, 12 months' confinement, and a mandatory dismissal—was not inappropriately severe. In making this determination, we understand full well that our authority under Article 66(c), UCMJ, to disapprove any sentence is not constrained by Article 56, UCMJ. *See United States v. Kelly,* 77 M.J. 404, 408 (C.A.A.F. 2018) (holding that because Congress has not explicitly limited this court's Article 66(c), UCMJ, review powers, and until it does this court retains "the power to disapprove" any Article 56, UCMJ, mandated minimum sentence). We decline to disapprove any portion of the appellant's adjudged sentence because, under the circumstances of this case, we are convinced that justice was done, and the appellant received the punishment—including the dismissal—he deserved. *Healy,* 26 M.J. at 395.

**H. CMO error**

Finally, the appellant asserts, without alleging any prejudice, that the CMO contains error as it does not reflect the military judge's dismissal of Specification 3 of the Charge. We agree that the CMO contains error. However, the error is not that alleged by the appellant. We take corrective action in our decretal paragraph.

After the appellant's conviction on both Specifications 3 and 4 of the Charge, the military judge noted that, although charged for contingencies of proof, both specifications were based on the same underlying conduct. He then alerted the counsel that he was inclined to *conditionally* dismiss one of the offenses. The government expressed that its desire was for *Specification 4* of the charge to be *conditionally* dismissed—Specification 4 alleged that LCDR LS was asleep or unconscious. Despite the military judge not articulating on the record that Specification 4 was conditionally dismissed, our review of the record convinces us that it was Specification 4 and not Specification 3 that was conditionally dismissed.[57] We note the CMO failed to reflect the *conditional* dismissal of Specification 4 of the Charge.

An appellant is entitled to an official record accurately reflecting the results of his proceedings. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1989). We test error in a CMO under a harmless-error standard. *Id.*

At a minimum, a CMO must contain the following information: (1) the type of court-martial and the convening command; (2) a summary of all charges and specification on which the appellant was arraigned; (3) the appellant's pleas; (4) the findings or *disposition of all charges and specifications on which the appellant was arraigned*; (5) if adjudged, the sentence; and (6) a summary of the action taken by the convening authority in the case. R.C.M. 1114(c)(1) (emphasis added). The failure of the CMO to reflect the conditional dismissal of Specification 4 of the Charge is error; however, the appellant does not assert, and we do not find any prejudice done to the appellant's substantial rights by this error.

### III. CONCLUSION

The findings and sentence are affirmed. The supplemental CMO will reflect that the military judge conditionally dismissed Specification 4 of the

---

[57] *See* Record at 1232-33, 1239, and 1241; Charge Sheet; AE LXXXIII (Findings Worksheet) and XCI (Sentencing Cleansed Charge Sheet).

Charge without prejudice, to ripen into prejudice upon completion of appellate review.

Senior Judge FULTON and Judge CRISFIELD concur.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court